**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEELE CLARKE SMITH III, an Individual, | Case No.: 3:13-cv-01463-BTM-BGS |
| Plaintiff, | **ORDER GRANTING PRELIMINARY INJUNCTION** |
| vs. | Barry Ted Moskowitz, C.J. |
| SAN DIEGO AMERICANS FOR SAFE ACCESS et al., | |
| Defendants. | |

Defendants/Counterclaimants San Diego Americans for Safe Access and San Diego Americans for Safe Access Foundation (the "Movants" or "ASA") seek a preliminary injunction against Plaintiff Steele Clarke Smith, III ("Smith" or "Plaintiff"). For the reasons stated herein, ASA's motion is GRANTED.

## I. BACKGROUND

A.  Facts

Steph Sherer founded Americans for Safe Access in 2002, and began using its title as a word mark at that time. Sherer created ASA to "share what I had learned about the

1
Preliminary Injunction

medical benefits of marijuana with others, particularly in connection with the federal prosecution of Edward Rosenthal. I selected the name 'Americans for Safe Access' in large part due to its acronym, ASA, which was the first name of the then-Administrator of the Drug Enforcement Administration, Asa Hutchinson." Sherer Decl. ¶4. Sherer also registered the web domain safeaccessnow.org. ASA provides education and legal materials/assistance in support of marijuana legalization and use for medical treatment. Sherer Decl. ¶15. It now has a national presence with six local chapters and over 50,000 members. Since 2006, ASA has used two logos—the "molecule" logo (attached here as Exhibit 1), and the "ASA" logo (the initials) (attached here as Exhibit 2). Sherer Decl. ¶¶5-8. In 2007, ASA formed an Orange County chapter. Sherer Decl. ¶16.

In 2009, the Plaintiff (Smith) lost an election for the presidency of the ASA Orange County chapter. Sherer Decl. ¶17. In 2011 he started his own organization, Americans for Safe Access National ("ASAN") and registered the web domain: ASANational.org. Sherer Decl. ¶¶18-19. He also applied to register the ASA word mark. Sherer Decl. ¶27. ASA objected to his registration of the mark. The record does not indicate that the PTO has adjudicated the application.

Since 2011, but mostly recently, Smith has sent emails to ASA members that refer to a change in ASA leadership and imply that Sherer is no longer ASA President. Sherer Decl. ¶¶22-3; Duncan. Decl. ¶4, Ex. D1. Smith uses ASA's marks on ASAN's website and in several emails soliciting donations. Sherer Decl. ¶¶27-36; Duncan Decl. Ex. D2.

2
Preliminary Injunction

Sherer alleges that Smith's deceptive website and deceptive emails harm recruiting efforts, intimidate ASA staff members, and aim to divert potential donations intended for the ASA by misleading donors.

B.      Procedural History

Plaintiff Steele Clarke Smith, III ("Smith" or "Plaintiff") brought this action alleging trademark infringement in May 2013.  He obtained a TRO in Superior Court (ECF 1-8), which was dissolved on June 6, 2013.  The case was then removed here. ASA filed counterclaims and an ex parte application for a temporary restraining order ("TRO") against Smith.  Notice of the application was duly provided to Plaintiff (Docs. 24, 26).  On February 11, 2014, the Court held a hearing on the application.  Plaintiff, *pro se*, did not appear at the hearing, and the Court issued a TRO covering the marks at issue (Doc. 27).[1]  The TRO scheduled a preliminary injunction hearing and ordered Plaintiff to show cause as to why an injunction should not issue.  A copy of that order was immediately served upon Plaintiff (Docs. 29, 30, 35, 36) at the last address provided to the Court.  At the April 1, 2014 hearing, ASA's counsel stated that they had also forwarded the TRO and Scheduling Order to Smith via email.  Smith filed no response and did not appear at the preliminary injunction hearing.

---

[1] ASA's proposed order included an injunction against use of the ASANational.org domain.  The TRO does not enjoin use of any web domain.  At the April 1, 2014 hearing, ASA's counsel clarified that ASA does not request any change in the scope of the injunction.  Therefore, this injunction does not enjoin the lawful use of any website.

3
Preliminary Injunction

## II. LEGAL STANDARD

Rule 65(a) of the Federal Rules of Civil Procedure authorizes a court to "issue a preliminary injunction only on notice to the adverse party." "A preliminary injunction is an extraordinary remedy" that is "never awarded as of right." Winter v. NDRC, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). A preliminary injunction will only be granted "upon a clear showing that the plaintiff is entitled to such relief." Id. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). To obtain a preliminary injunction, the plaintiff must establish four elements: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." Id. at 20 (citations omitted).

The requirement that irreparable harm be likely is significant; a mere possibility of harm will not suffice. Id. at 22; Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 997-98 (9th Cir. 2011) (criticizing Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873 (9th Cir. 2009)). See also ConocoPhillips Co. v. Gonzalez, 2012 WL 538266, at *2, 2012 U.S. Dist. LEXIS 20972, at *6 (N.D. Cal. Feb. 17, 2012); Leatherman Tool Group, Inc. v. Coast Cutlery Co., 823 F. Supp. 2d 1150, 1157 (D. Or. 2011). Moreover, the irreparable injury must be imminent. Caribbean Marine Services Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988); Midgett v. Tri-County Metro. Transp. Dist. of Oregon, 254 F.3d 846, 850-851 (9th Cir. 2001).

//

## III.  DISCUSSION

**A.     Trademark Infringement**

A trademark is "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods." 15 U.S.C. § 1127. "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" Network Automation, Inc. v. Adv. Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting Dep't of Parks & Recreation v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)).

1. Protectable Ownership Interest

Ownership interests in a trademark accrue to the first party to actually use the mark in commerce. See Sengoku Works LTD v. RMS Int'll, LTD, 96 F.3d 1217, 1219 (9th Cir. 1996) (citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 16.03 (3d ed. 1996)).  The first to use a mark (the "senior" user) may enjoin "junior" users from using confusingly similar marks in the same market or within the senior user's "natural zone of expansion." Church & Dwight Co. v. Mayer Labs., Inc., 2011 U.S. Dist. LEXIS 35969, 66-67 (N.D. Cal. Apr. 1, 2011) (citation omitted).  A plaintiff's federal registration of a trademark is prima facie evidence of an ownership interest, but a defendant may rebut the presumption by proving their own prior use of the

mark in commerce. See Dep't of Parks & Recreation, 448 F.3d at 1124; 15 U.S.C. §§ 1057(b), 1115(a).

According to Sherer, ASA has used the ASA word mark since 2002, and has used the "molecule" logo and the ASA logo since 2006. Sherer Decl. ¶¶4-5. ASA uses the marks to identify itself and its members to the public. Sherer Decl. ¶¶9, 15. To that end, each mark has been used, e.g., on ASA's website, correspondence, conference materials, and litigation materials. Id. ASA has thus satisfactorily demonstrated its ownership interest in the marks *sub judice*. ASA has not registered the marks, but can, according to its supporting declarations, establish an ownership interest in them as of 2002 (word mark) and 2006 (logos). Sherer Decl. ¶¶4-9.

2. Likelihood of Consumer Confusion

The Ninth Circuit applies a flexible, multi-factor test to gauge the likelihood of confusion caused by an allegedly infringing mark. See Network Automation, Inc., 638 F.3d at 1145. Eight "*Sleekcraft*" factors are typically considered: "similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of [the plaintiff's] mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; [the defendant's] intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines." Brookfield Commc'ns., Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1053-54 (9th Cir. 1999) (citations omitted); accord AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). It bears noting, however, that this list is not

exhaustive, no single factor is dispositive, and that the relative importance of each factor will vary from case to case. See Brookfield Commc'ns., Inc., 174 F.3d at 1054.

### a. Similarity of the Marks

"[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." Brookfield Commc'ns., Inc., 174 F.3d at 1054-55. Moreover, "similarities are weighed more heavily than differences." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000), abrogated on other grounds by Winter, 555 U.S. at 22. ASA's exhibits indicate that their three marks and those used by Smith are identical or virtually identical to (i.e., identical in structure and appearance excepting, in some instances, slight variations in size and coloring). Compare, e.g., Sherer Decl. Exs. 1-3 with ¶¶22-33, Exs. 4-6, 12-15 (describing Smith's uses of the marks). Duncan Decl. Ex. 2. As it is impossible to get more similar than identical, this factor weighs heavily in favor of injunctive relief. See Network Automation, Inc., 638 F.3d at 1144.

### b. Relatedness or Proximity of the Products

The mission of each organization is very similar, as evidenced by a side-by-side comparison of mission statements in the table below. Moreover, according to Don Duncan, ASA's California Director, Smith's organization has sought donations from the same people and is opening chapters in the same locations as ASA. Duncan Decl. ¶4, Ex.2. This factor thus weighs in favor of an injunction.

//

| ASA Mission Statement (Sherer Decl. ¶34, Ex. S11) | ASAN Mission Statement (Sherer Decl. ¶35, Ex. S12) |
|---|---|
| Americans for Safe Access (ASA) and Americans for Safe Access Foundation (ASAF) share the mission of ensuring safe and legal access to cannabis (marijuana) for therapeutic uses and research.  ASA works with our grassroots base of over 50,000 members to effect change using public education and direct advocacy at the local, state, and federal level.  ASAF trains and educates patients, advocates, health care professionals and other stakeholders.  ASAF also provides direct legal support and uses impact litigation to protect and expand patients' rights. | Americans for Safe Access® is the largest National organization of patients, medical professionals, scientists and concerned citizens. Our mission is to realize safe, legal access to cannabis for medical and therapeutic purposes, and to provide resources and support to medical cannabis patients, their associations, and to the medical cannabis industry through local chapters and grassroots action. |

*c. Strength of the Marks*

At this stage, a mark's strength is typically gauged by its conceptual strength. Network Automation, Inc., 638 F.3d at 1149-50. "[C]onceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." Id. at 1149.  Marks are often ranked "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." Id.

Movant concedes that the ASA logo is descriptive, but argues it is entitled to protection nonetheless due to its secondary meaning.  To determine whether a descriptive mark has a secondary meaning, the Court considers (1) whether actual purchasers of the product bearing the claimed trademark associate it with the producer, (2) the degree and manner of advertising under it, (3) the length and manner of its use, and (4) whether its use has been exclusive.  Yellow Cab of Sacramento v. Yellow Cab of Elk Grove, Inc.,

419 F.3d 925, 930 (9th Cir. 2005). ASA contends that the use of each mark was consistent (since 2002 for the ASA word mark and since 2006 for the others) and exclusive until Smith's alleged infringements began in 2011. Sherer Decl ¶¶5-9, 19. Ms. Sherer's declaration thus indicates that the ASA logo has a secondary meaning entitled to protection. Moreover, Smith has conceded the point, for present purposes, by failing to file a response. CivLR 7.1.f.3.c (Waiver by Opposing Party). <u>Ardente, Inc. v. Shanley</u>, 2010 U.S. Dist. LEXIS 11674 (N.D. Cal. Feb. 9, 2010) ("Plaintiff fails to respond to this argument and therefore concedes it through silence."); <u>Silva v. U.S. Bancorp</u>, 2011 U.S. Dist. LEXIS 152817, 2011 WL 7096576, *3 (C.D. Cal. 2011).

### *d. Marketing Channels Used by the Parties*

The parties share marketing channels, though the extent of overlap is unclear. The marketing channels described in ASA's papers are primarily the internet and email. Marketing channel overlap on the internet is generally only regarded as posing a risk of confusion for consumers when "both parties use the Web as a substantial marketing and advertising channel." <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1151 (9th Cir. 2002). Here, the parties use each of the three marks at issue on their websites. Duncan Decl. ¶5. They also appear to have chapters in some of the same cities. Sherer Decl. ¶25. Additionally, to the extent member and donor solicitations by email constitutes marketing, ASA has provided evidence that the overlapping channel exacerbates confusion. Sherer Decl. ¶¶25-36; Duncan Decl. ¶4. This factor therefore weighs in favor of injunctive relief.

*e. Degree of Care Used By Consumers*

As no party has provided briefing as to this factor, the Court treats it as neutral.

*f. Intent in Selecting Mark*

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993). Here, ASA has demonstrated that Smith used the marks at issue, beginning in 2011, with the first-hand knowledge, based on his time and experience with ASA, that each was ASA's mark. See, e.g., Sherer Decl. ¶¶16-17. ASA has also indicated, via evidence of email solicitations and donation requests on the ASANational.org website, that Smith has used the marks in an effort to misappropriate donations intended for ASA. Sherer Decl. ¶¶27-33; Duncan Decl. 4, 5. This factor thus weighs in favor of injunctive relief.

*g. Evidence of Actual Confusion*

ASA members have expressed confusion over whether Smith remains involved with ASA. Sherer Decl. ¶26. Smith is ostensibly responsible for emails from ASAN soliciting money and discussing internal management that are confusing, as they appear to be masquerading as emails from ASA. Duncan Decl. ¶4, Ex. D2. This factor hence weighs in favor of injunctive relief.

*h. Likelihood of Expansion in Product Lines*

"The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." Brookfield Commc'ns.,

Inc., 174 F.3d at 1060. The record indicates that the parties share a common mission and target at least some of the same persons with informative materials and donation solicitations. It appears that the parties intend to further expand into each other's product lines. See, e.g., Sherer Decl. ¶25, Ex. 4 (indicating that ASAN is forming "new chapters in San Diego and Maryland—locations in which ASA already has established substantial local chapters . . . ."). This factor does not apply precisely as it would in the product marketing context, since people may wish to be members of both organizations, and may even knowingly choose to donate to each, or to one over the other. The analogy holds, however, to the extent that people prefer to choose one, and have their attention or money diverted to ASAN when they intend it to go to ASA. On this record, the Court finds this factor to be neutral.

    3. Conclusion

Having considered each of the *Sleekcraft* factors, the Court concludes that Plaintiff has clearly established a likelihood of consumer confusion. The marks are, for the most part, indistinguishable, such that a reasonably prudent consumer is likely to be confused by Smith's use of them. Moreover, there is evidence of intent to deceive and that actual confusion has resulted. The Court thus moves on to consider the remaining factors in the preliminary injunction analysis.

**B.**     **Irreparable Harm**

A party seeking preliminary injunctive relief must establish a likelihood of irreparable harm. See Flexible Lifeline Sys., 654 F.3d at 997-98. Even showing a high

11
Preliminary Injunction

likelihood of success does not portend irreparable harm or otherwise create a right to preliminary relief.  See id.; Winter, 555 U.S. at 20-22.  A mere possibility of irreparable harm will not suffice; the alleged harm must be more than speculative. See Caribbean Marine Servs. Co., 844 F.2d at 674.  The Court found a likelihood of irreparable harm to ASA's at the TRO hearing.  TRO (Doc. 27) at 3.  As this finding has gone unrebutted, it stands.  More specifically, the Court finds that ASA has provided sufficient evidence of harm to its reputation and threatened loss of prospective donors or members, as well as harm to goodwill and the diminished ability to control its reputation more generally.  See Stuhlbarg Int'l Sales Co. v. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (upholding finding of irreparable harm based on "threatened loss of prospective customers" and "accompanying goodwill and revenue").

## C. **Balancing the Equities**

Weighed against Smith's interest in continued use of the marks for his organization are the costs, both monetary and reputational, that ASA has shown it faces in the absence of injunctive relief.  As Smith has not appeared to place his interests on the scale, the Court finds that the balance of equities strongly favors the grant of a preliminary injunction in this case.

## D. **The Public Interest**

Finally, a preliminary injunction ought to issue only where it is in the public interest.  In this case, ASA has provided sufficient evidence that Smith is using the marks *sub judice* without permission in an attempt to, *inter alia*, divert attention and

funds toward his own organization.  The public has a compelling interest in having a marketplace free of deceptive or misleading marketing.  See generally CytoSport, Inc. v. Vital Pharm., Inc., 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009).

With respect to the admittedly "descriptive" ASA word mark, the public has also has an interest in preventing the monopolization of common terms that can be used to describe a wide range of products.  Estate of P. D. Beckwith, Inc. v. Comm'r of Patents, 252 U.S. 538, 543-44 (1920).  A trademark holder can adopt as its mark a word that is sufficiently artificial to enjoy a high degree of conceptual strength that is also sufficiently similar to a common descriptor, such that the mark will instantly evoke the common word and its meaning.  But the trademark holder cannot, consistent with public policy, enjoin all use of that common word by competitors.  See Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 170-171 (7th Cir. 1996).  In this case, ASA has shown a secondary meaning for the ASA word mark, such that a preliminary injunction limited to Smith promotes the public interest with minimal risk of the monopolization of the descriptive mark.  The Court accordingly finds that, for each of the marks *sub judice*, preliminary injunctive relief is consistent with the public interest.

## IV.  CONCLUSION

Upon consideration of the application and the evidence submitted (and for the reasons stated on the record at the April 1, 2014 hearing), the Court finds as follows:

1. ASA is likely to succeed in demonstrating that it maintains a legally protectable ownership interest in the intellectual property depicted in Exhibits 1, 2, and 3 to

    this Order. Exhibit 1 depicts the name "Americans for Safe Access," hereinafter referred to as the ASA word mark. Exhibit 2 depicts the primary logo that ASA uses, hereinafter referred to as the ASA logo. Exhibit 3 depicts an alternative logo that ASA uses, hereinafter referred to as the ASA molecule;

2. ASA is likely to succeed in demonstrating that Smith's use of the ASA word mark, the ASA logo, and/or the ASA molecule is likely to cause confusion, or to cause mistake, or to deceive;

3. ASA is likely to suffer irreparable harm if preliminary relief is not granted;

4. The balance of equities tips in ASA's favor; and

5. A Preliminary Injunction is in the public interest.

**WHEREFORE, THE COURT ORDERS AS FOLLOWS:**

1. ASA's Motion for a Preliminary Injunction is **GRANTED**;

2. Plaintiff ("Smith"), his agents, servants, employees, attorneys, and all persons in active concert or participation with Plaintiff, his agents, servants, employees, or attorneys are hereby enjoined from advertising, promoting, marketing, publishing, or otherwise using the ASA word mark, the ASA logo, the ASA molecule, or any other mark (as defined in 15 U.S.C. § 1127) that is confusingly similar to the ASA word mark, ASA logo, or "ASA molecule" including, but not limited to, on or in any website, newsletter, electronic mail, publication, letter or written material, or any other public medium, including but not limited to the domain <ASANational.org>;

14
Preliminary Injunction

3. Dispositive motions in this case shall be filed on or before **July 11, 2014**. The parties' opposition and reply papers shall be filed in accordance with Local Civil Rule 7.1;

4. ASA need not post security pursuant to Fed. R. Civ. P. 65(c) because such a requirement would impose an undue hardship on this record.

**IT IS SO ORDERED.**

Dated: April 30, 2014  
6:22 p.m.  
San Diego, CA

Barry Ted Moskowitz, Chief Judge  
United States District Court